# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

JOY M. BILLUE,                                    )
                                          )

           Plaintiff,                           )

                                            )

      v.                                           )         No. 2:14-cv-04127-NKL

                                            )

AETNA LIFE INSURANCE COMPANY,      )

                                            )

           Defendants.                         )

## ORDER

Pending before the Court are the cross motions for summary judgment of Plaintiff Joy Billue and Defendant Aetna Life Insurance Company. [Docs. 21 and 23]. For the reasons set forth below, Defendant's motion for summary judgment, Doc. 23, is granted. Plaintiff's motion for summary judgment, Doc. 21, is denied.

## I. Undisputed Facts

### A. Billue's Benefits and the Plan Document

Billue worked as a utility operator for Hubbell Power Systems in Centralia, Missouri until May 26, 2011. [R. 335]. The job description for this position is as follows:

> Operator will be required to set-up, operate, and to adjust machines and equipment in order to produce a good quality product. Examples of machines and equipment are, but not limited to, crane, forklift, hoist, spinner, tumbler, reclaimer, boiler, and other department equipment.
>
> Processes performed will be, but not limited to, inspecting, gauging, counting, pickling, galvanizing, tumbling, drossing, reclaiming, racking, stacking, loading, and unloading.

Operator must have the ability to interpret routing sheets and have the ability to satisfactorily use measuring devises, and perform SPC as required.

Operator may be required to make visual inspections, separate parts, record production, record scrap, keep required production records, and other operations as required.

Operator will be required to maintain acid concentration and temperatures of liquids in accordance with company procedures.

Operator will be required to furnish own hand tools.

Operator will be required to maintain machines, equipment, and work area in a clean and orderly manner.

Operator must ensure that any hazardous waste generated must be properly packaged and labeled before removing from his/her area.

[R. 145]. In order to perform these job functions, Hubbell requires that utility operators meet the following physical standards:

Ability to sit and/or stand and perform repetitive work for a minimum of eight hours.

Ability to walk, hear, see, and have full use of both hands.

Ability to lift 50 lbs. from floor to waist and waist to floor.

Ability to lift in excess of 65 lbs.

Ability to pull 60 lbs. suspended by a crane into the proper position.

Ability to lift 30 lbs. and carry a distance of 4 feet at a height of 4 feet.

Ability to work off of a platform.

These physical requirements are generalities and work may occasionally exceed the specified levels.

2

[R. 146].

On June 13, 2011, Billue underwent a transvaginal hysterectomy. [R. 555-64]. She experienced complications with her surgery and in November 2011 underwent vein surgery. [R. 790]. Subsequently, Billue requested long term disability ("LTD") benefits due to chronic phlebitis of saphenous vein. [R. 275, 533-34]. The effective date of her LTD was November 27, 2011. [R. 369].

Aetna issued a determination that Billue was eligible to receive monthly benefits for up to "24 months as long as you remain totally disabled from your own occupation." *Id.* In order to be considered disabled, Billue had to be unable "to perform the material duties of [her] own occupation solely because of disease or injury; and [have] earnings [of] 80% or less of [her] adjusted pre-disability earnings." *Id.* "Own occupation" is defined as "the occupation that you are routinely performing when your period of disability begins." [Policy 15]. Billue received $1888.18 in benefits per month. [R. 370].

Under the Aetna policy, benefits terminate on "[t]he date Aetna finds you are no longer disabled or the date you fail to furnish proof that you are disabled." [Policy 5]. The policy also provides:

> Your claim must give proof of the nature and extent of the loss. Aetna may require copies of documents to support your claim, including data about any other income benefits. You must also provide Aetna with authorizations to allow it to investigate your claim and your eligibility for and the amount of other income benefits.
>
> You must furnish such true and correct information as Aetna may reasonably request.

[Policy 11]. In accordance with the policy, Billue signed an Authorization for Aetna to Request Protected Health Information Necessary to Process a Disability Claim on September 20, 2011. [R. 478-79]. That same day she provided a Supplemental Information Questionnaire identifying Dr. William Bradley as her doctor and providing his contact information, a list of her medications, and the name, address, and phone number of her pharmacy. [R. 483-84].

The plan noted that Aetna is a fiduciary with complete authority to review claims for denied benefits. [R. 68]. It provided that:

> In exercising such fiduciary responsibility, Aetna shall have discretionary authority to:
>
>> determine whether and to what extent employees and beneficiaries are entitled to benefits; and
>>
>> construe any disputed or doubtful terms of this policy.
>
> Aetna shall be deemed to have properly exercised such authority unless Aetna abuses its discretion by acting arbitrarily and capriciously.

*Id.* The plan also noted that the fiduciaries operating the plan "have a duty to do so prudently and in [the plan participant's] interest and that of other plan participants and beneficiaries." [R. 29].

## B. Billue's Denial

On March 12, 2012, Aetna sent Billue a letter regarding her continued eligibility for LTD benefits. [R. 375-76]. The letter requested that Billue provide a completed Attending Physician Statement from her disabling provider, completed Capabilities and

Limitations Worksheet from her disabling provider, completed Treating Physicians List, completed Medications List, and completed Work History and Education Questionnaire. *Id.* Aetna sent Billue a substantively identical letter on April 19, 2012, giving Billue until May 3, 2012 to submit the information. [R. 388-89]. On May 29, 2012, Aetna sent a third letter stating that they had not yet received the information and requesting it by June 12, 2012. [R. 401-02]. On June 14, 2012, Aetna sent a letter to Billue stating that her benefits had been terminated effective the date of the letter because Aetna had not received the requested information to evaluate Billue's eligibility for benefits under the plan provisions. [R. 414-15].

On June 22, 2012, Aetna informed Billue that it had received additional information including a Medication List and an Attending Physician Statement, but stated that it was not sufficient for her claim to be reversed. [R. 417]. Aetna informed Billue that the Attending Physician Statement was not legible. *Id.*

On July 23, 2012, Aetna sent a letter to Billue indicating that it had received her appeal request on July 19, 2012, and had begun its review on appeal. On July 29, 2012, Billue signed a second Authorization for Aetna to Request Protected Health Information Necessary to Process a Disability Claim form. [R. at 507-08]. That same day she submitted a Disability Appeal Request Form indicating that she was appealing the claim denial because "I was denied because they could not read my doctor's handwriting. My medical cond. have not changed." [R. 620]. Billue indicated in her appeal that she had veins clotting in her left leg, stomach and back problems, headaches, and was unable to

perform her job because she could not stand on her feet. [R. 621]. She noted on her form that she did not intend to submit additional records for review on appeal. *Id.*

On August 14, 2012, Aetna sent Billue a follow up letter to her appeal, stating that the most current office notes Aetna had were dated September 1, 2011, and most current lab studies were dated December 15, 2011. [R. 425]. The letter indicated that Aetna left messages for Billue on August 8, August 10, and August 13 which were not returned. *Id.* The letter went on to state that "in order for [Billue] to qualify for continued disability benefits, [she] must provide current medical data with objective findings to substantiate [her] disability. Therefore, since [Aetna is] aware that additional documentation exists which may support [Billue's] claim for disability benefits, the appeal review is being placed on hold until the additional materials are received. Please submit all documentation for review by September 12, 2012." *Id.* Billue did not submit additional documents for review.

In completing review of Billue's appeal, Aetna sent Billue's file for independent medical review by an internist, Dr. Wendy Weinstein. [R. 342]. Dr. Weinstein completed her report on October 10, 2012, which explained that she had been unable to reach Dr. Bradley for additional information beyond what Billue had provided. [R. 501-06]. Had she been able to speak with Dr. Bradley, she would have asked for examination findings or complications from Billue's phlebitis that would impact Billue's ability to return to work. *Id.* Dr. Weinstein noted that the records Aetna had did not show that Billue had seen Dr. Bradley after January 6, 2012, and there was no documentation that she continued to suffer from deep vein thrombosis or had any other complications that

would prevent her from working. [R. 504]. She found no documentation of actual pulmonary embolism, respiratory distress, hypoxemia, or abnormal pulmonary function studies. *Id.* Based on her review of Billue's records, Dr. Weinstein concluded that Billue had no functional impairments that would prevent her from performing her job. *Id.*

On November 2, 2012, Aetna informed Billue that the decision to terminate her benefits had been upheld. [R. 431-33]. This letter recognized that a January 6, 2012 medical record from Billue's appointment with Dr. Bradley referenced Billue being anticoagulated with Lovenox. *Id.* It also noted that Dr. Bradley opined that Billue had a history of venous thrombosis and that she was permanently disabled but was not a candidate for surgery due to her blood disorder. *Id.* Senior Appeals Specialist Kay Bryant found that there was insufficient medical evidence to support a functional impairment which precluded her from performing the material duties of her own occupation as of June 14, 2012, which resulted in her decision to uphold the termination of Billue's LTD benefits effective June 14, 2012. *Id.*

## II. Discussion

Both Billue and Aetna have filed motions for summary judgment in this matter, contending that there are no genuine issues as to any material facts in the case and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). As both parties argue, there are no disputes as to any material facts. Therefore, the remaining question before the Court is which party is entitled to judgment as a matter of law.

### A. Review of Denial of Benefits Under ERISA

The plan and administration of benefits in this case are governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). In general, a court reviewing a plan administrator's decision to deny benefits applies a de novo standard of review. *Firestone Tire and Rubber Co. v. Brunch*, 489 U.S. 101, 115 (1989). If the plan grants the claims administrator discretionary authority, however, the administrator's decision is reviewed only for an abuse of discretion. *Id.* The Aetna policy provides that the administrator has the discretionary authority both to determine whether employees are entitled to benefits and construe the terms of the policy. [R. 68]. Therefore, the question is whether Aetna abused its discretion when it terminated Billue's LTD benefits.

Under the abuse of discretion standard, the Court may not vacate the plan administrator's decision simply because it disagrees with it. Instead, the Court must affirm the plan administrator's denial if it was supported by "substantial evidence." *Carlson v. Standard Ins. Co.*, 920 F. Supp. 2d 1028, 1032 (W.D. Mo. 2013). A decision is supported by substantial evidence if there is sufficient "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *McGee v. Reliance Standard Life Ins. Co.*, 360 F.3d 921, 924 (8th Cir. 2004)); *see also Lawyer v. Hartford Life & Acc. Ins. Co.*, 100 F. Supp. 2d 1001, 1011 (W.D. Mo 2000) (describing substantial evidence as "more than a scintilla but less than a preponderance" (quoting *Woo v. Delux Corp.*, 144 F.3d 1157, 1162 (8th Cir. 1998))).

In determining whether Aetna abused its discretion, the Court must account for the inherent conflict of interest of the plan administrator. When an entity administering a plan both determines benefits eligibility and pays benefits, a conflict of interest exists for

8

the administrator who owes a fiduciary obligation to the employee and also has a corporate interest in avoiding paying out claims. *Chronister v. Unum Life Ins. Co. of America*, 563 F.3d 773 (8th Cir. 2009) (citing *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008)). The Supreme Court addressed how this conflict of interest is to be weighed in *Metropolitan Life Insurance Company v. Glenn* and instructed that it should be considered as a "factor" in evaluating the propriety of the administrator's decision. *Glenn*, 554 U.S. at 116-17.

> The conflict of interest here . . . should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy . . . .

*Id.* at 117.

The Court must also account for any "serious procedural irregularities" that arise in the course of the plan administrator's review of the claim. A "serious procedural irregularity" is one which would be sufficient under the common law of trusts to cause the application of a less deferential standard of review. *Pralutsky v. Metropolitan Life Ins. Co.*, 435 F.3d 833, 838 (8th Cir. 2006). The Eighth Circuit has acknowledged that a serious procedural irregularity arises when an administrator makes a decision "'without knowledge of or inquiry into the relevant circumstances and merely as a result of [its] arbitrary decision or whim.'" *Id.* (quoting Restatement (Second) of Trusts § 187 cmt. h (1959)). For purposes of this order, the Court will assume that a serious procedural

9

irregularity should be treated in the same way as a conflict of interest. *See Miller v. American Airlines, Inc.*, 632 F.3d 837, 848 (3d Cir. 2011) (considering procedural irregularity as "a significant factor to be weighed on arbitrary and capricious review").

## B. Aetna's Termination of Billue's Benefits Did Not Constitute an Abuse of Discretion

Billue raises two issues that she argues rise to the level of "serious procedural irregularities" in Aetna's review of her claim. First, she argues that the administrator improperly failed to consider the side effects of her medications in determining whether she would be capable of performing her job. Second, she contends that Aetna failed to adequately investigate Billue's claim by failing to obtain her treatment records from Dr. Bradley. Neither of these actions rises to the level of a serious procedural irregularity. Furthermore, the evidence shows that Aetna completed a thorough and fair review of the evidence in the case. Therefore, Aetna did not abuse its discretion in terminating Billue's benefits under the policy.

Aetna's conduct prior to terminating Billue's benefits makes clear that the termination was not based on an attempt by Aetna to skirt its duties or prevent Billue from obtaining benefits to which she is entitled. Aetna gave Billue every opportunity to present medical evidence of her continuing disability in order to continue receiving her LTD benefits. Billue's repeated failure to furnish the requested information resulted in a proper termination of her LTD benefits under the policy.

Billue had an obligation under the terms of the policy to provide ongoing proof of disability to remain eligible for LTD benefits. Specifically, the policy stated that a

10

claimant's LTD benefits would terminate "the day you fail to furnish proof that you are disabled." [Policy 5]. In providing proof of disability, the policy stated that the claimant "must give proof of the nature and extent of the loss. . . . You must also provide Aetna with authorizations to allow it to investigate your claim . . . . You must furnish such true and correct information as Aetna may reasonably request." [Policy 11]. These provisions clearly informed Billue that it was her obligation, not Aetna's, to demonstrate that she qualified for ongoing benefits.

On March 12, 2012, Aetna informed Billue that she needed to submit information regarding her continued eligibility for LTD benefits. The letter requested a completed Attending Physician Statement from her disabling provider, completed Capabilities and Limitations Worksheet from her disabling provider, completed Treating Physicians List, completed Medication List, and completed Work History and Education Questionnaire. [R. 375, 388, 401]. The letter then explained that "[t]he above information is necessary for us to determine whether you meet the above definition of disability, and determine whether or not you are eligible for LTD benefits." *Id.* Billue did not respond to this letter. On April 19, 2012, Aetna sent Billue a substantively identical letter requesting the information by May 3. [R. 388-89]. Billue once again did not respond and Aetna mailed her a third letter on May 29 requesting the documentation by June 12. [R. 401-02]. On June 14, 2012, three months after first requesting information from Billue and having received no response to three separate letters requesting medical documentation, Aetna terminated Billue's LTD benefits. [R. 414-15].

11

The course of communication between Billue and Aetna even at this early stage of the communications makes clear that Aetna was not attempting to wrongfully deprive Billue of benefits to which she was entitled. Aetna provided Billue an extended period of time to respond to its requests for documents and sent multiple letters asking for evidence of continuing disability.

Soon after Aetna informed Billue that her benefits were being terminated, Billue submitted two of the five documents requested by Aetna in its earlier communications: a Medication List and an Attending Physician Statement. [R. 417]. However, the Attending Physician Statement was not legible. *Id.* On June 22, Aetna sent Billue a letter informing her that the statement was not legible and that the information she submitted was not sufficient to warrant reversal of her claim. In this denial letter, Aetna specifically noted that "we do not have any updated medical records, the last office visit notes we have on file are date 7/24/2011 and 9/1/2011. The last testing results we have on file are dated 12/8/2011 and 12/14/2011." *Id.* Aetna's denial letter from June 14 had also informed Billue that she could submit additional evidence to be reviewed on appeal including "physician's prognosis including current course of treatment, frequency of visits, office visit/treatment notes, specific medications prescribed; diagnostic studies conducted during the above period, such as test results, X-rays, laboratory data, and clinical findings." [R. 414-15].

Despite having been informed that Aetna was not in possession of her medical records after the dates listed and being told that she could submit additional records for review on appeal, Billue never provided Aetna additional medical records or evidence of

12

her disability following this denial and Billue's submission of her notice of appeal. Billue contends that she did not submit her medical records at this point because while Aetna informed Billue it was not in possession of the records, it never requested that Billue send the records to the company. However, Aetna was not required to explicitly state that Billue needed to send these records to the company for review. That requirement had already been communicated to Billue in the plan documents. The plan placed the burden on Billue to present evidence of her continuing disability, not the insurance company to inform Billue of every piece of evidence she needed to submit for review. Moreover, any ambiguity in the letters about Aetna's request for Billue to provide it with the medical records was very slight, and a reasonable person would have understood based on Aetna's communications that she needed to submit medical evidence and records to Aetna for review on appeal.

On August 14, 2012, Aetna mailed Billue another follow up letter indicating that a representative from the insurance company had left messages for Billue on August 8, August 10, and August 13. [R. 425]. None of these calls were returned. *Id.* However, Aetna indicated that it was aware that additional documentation existed to support Billue's claim and stated that the review of Billue's appeal was on hold until Aetna received the additional materials. *Id.* This letter then stated that Billue should "submit all documentation for review by September 12, 2012." *Id.* Once again, Billue did not respond to Aetna's letter or submit any additional evidence of her disability.

Despite being given repeated opportunities to send Aetna evidence, Billue failed to provide the company with requested documents, and failed to submit medical evidence to

13

support her claim. This course of communication does not suggest that Aetna was behaving irregularly or attempting to exclude evidence of Billue's disability from consideration. *See Braile v. Fort Dearborn Life Insurance Company*, 2005 WL 2563185 (W.D. Mo. Oct. 11, 2005) ("where the failure to obtain records does not indicate an attempt by the administrator to exclude unfavorable evidence, there is no procedural irregularity"); *see also Pralutsky*, 435 F.3d at 838 (noting that a plan administrator may not terminate a claimant's benefits "'without knowledge of or inquiry into the relevant circumstances and merely as a result of [its] arbitrary decision or whim.'" (quoting Restatement (Second) of Trusts § 187 cmt. h (1959)).

Even after Billue ignored Aetna's requests for additional medical evidence regarding her claim, Aetna continued to investigate the claim on appeal, sending Billue's file for independent review by Dr. Wendy Weinstein. Dr. Weinstein reviewed the entirety of Billue's file and attempted to contact Billue's doctor for additional information regarding her claim. Dr. Bradley did not respond to Dr. Weinstein's call. [R. 501-06]. After Dr. Weinstein completed her report, Aetna sent the report to Dr. Bradley for review and comment. [R. 430, 500]. After ten days, Aetna had received no response or additional medical records from Dr. Bradley. [R. 348]. It was only after this waiting period that Aetna issued its final decision on Billue's appeal and upheld its decision to terminate her benefits. [R. 431-33].

Aetna's ongoing attempts to acquire medical documentation and review from Billue and her doctor indicate that the termination of Billue's benefits was based not on procedural irregularities, but on Billue's failure to furnish evidence of ongoing disability

14

in accordance with the policy. Contrary to the cases cited by Billue in support of her arguments regarding procedural irregularities, there is no suggestion here that Aetna intentionally disregarded medical records, inhibited Billue from presenting evidence of ongoing disability, or attempted to twist Billue's claim to prevent her from continuing to receive LTD benefits. *C.f. Harrison v. Wells Fargo Bank, N.A.; Wells Fargo and Company Disability Plan*, 773 F.3d 15, 20 (4th Cir. 2014) (noting that the Plan Administrator cannot be willfully blind to medical information that may support a claimant's disability theory); *c.f. Harden v. American Express Financial Corp.*, 384 F.3d 498, 499-500 (8th Cir. 2004) (concluding that the plan administrator committed a serious procedural irregularity by requesting some of claimant's medical records but not Social Security records that supported his claim, even though the plan required the claimant to apply for Social Security benefits).

Billue contends that because Aetna required her to provide it with a release form allowing it to independently request her medical records, Aetna committed a serious procedural irregularity by failing to request the medical records and never notifying Billue of her obligation to provide her medical records to the company. As discussed above, the content of Aetna's communications should have prompted Billue to submit additional medical evidence, including relevant medical records. Moreover, simply requiring policy holders to provide release forms does not shift the burden from the claimant to the plan administrator to acquire evidence of the claimant's disability. The plan was clear that claimants were required to both submit the signed release form and

provide evidence of their continuing disability.  It never suggested that submitting the release form altered the claimant's obligation to furnish proof of disability.

Billue further argues that Aetna erred in not considering the side effects of her medications in concluding that she could perform her job.  However, there is no evidence that Billue suffered from any of these side effects.  *C.f. Torres v. UNUM Life Ins. Co. of America*, 405 F.3d 670, 678 (8th Cir. 2005) (noting that the insurer's failure to acknowledge the side effects of the claimant's prescription drugs was significant because the claimant had explained that he suffered side effects).  Billue's medical records from 2007 indicated that she had a history of deep vein thrombosis with history of pulmonary embolism.  Her doctor commented in June 2012 that she had acute phlebitis of her leg and was intolerant to medication, but there is no evidence of what, if any, side effects she suffered as a result of this intolerance.  Though her medical records from October 2011 indicated that she was incapacitated due to her condition, Billue has presented no evidence of continuing incapacity any time in 2012.  A single prothrombin time/inr test indicating that Billue's readings were high in relation to her Warfarin therapy is insufficient for the Court to conclude that Aetna should have continued her LTD benefits based on her medications.

Billue cites to a number of Federal District Court opinions considering the side effects of prescription blood thinners in determining the claimant's ability to work. While these opinions all suggest that the side effects of blood thinners are relevant to a claimant's ability to work, the opinions all include recommendations from doctors that the claimant restrict activities due to the prescription.  Here, neither Billue herself nor her

doctor ever suggested that Billue's activities needed to be limited due to her prescription regimen. Without even the suggestion from a doctor that Billue was limited in her ability to perform her job due to her prescriptions, Aetna's failure to consider or recognize limitations on Billue's ability to work cannot constitute a procedural irregularity.

Billue also lists a number of other prescription medications she was talking in 2012, including Hydrocodone and Paroxetine. However, she presented no evidence that she suffered from side effects in relation to these prescription medications. Therefore, Aetna did not act improperly in terminating her benefits without accounting for potential side effects of these drugs.

Finally, Billue has submitted no additional evidence to the Court beyond what was provided to Aetna to suggest that her disability continues to prevent her from working. She has not presented medical records to show what Aetna would have had available had it obtained Billue's records independently. Thus, this is not a case where the insurance company is trying to avoid evidence that would be adverse to its decision.

## III. Conclusion

For the reasons set forth above, Defendant's motion for summary judgment, Doc. Doc. 23, is granted. Plaintiff's motion for summary judgment, Doc. 21, is denied.


/s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: June 5, 2015
Jefferson City, Missouri

18